OPINION
Kenya Thompson appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which terminated her parental rights over Kambon Jackson, Jr. ("Kambon") and awarded permanent custody of Kambon to the Montgomery County Children Services Board ("MCCSB").
On March 12, 1997, MCCSB filed a sworn complaint alleging that Kambon, born September 2, 1996 to Thompson and Kambon Jackson, Sr. ("Jackson"), was a neglected child. Thompson was sixteen years old at the time the complaint was filed. MCCSB became involved with the case in January 1997 while Kambon was hospitalized for bronchiolitis. At a meeting with the family on February 12, 1997, MCCSB instituted a "safety plan," which required Thompson to stay with Kambon at the home of her mother, Kimberly Gresham, to provide for his medical needs, to seek welfare assistance, and to obtain her G.E.D. The complaint alleged that, in violation of the safety plan, Thompson had been "running the streets, and/or staying with alleged father who has a criminal record related to possession of crack cocaine and who reportedly sells crack cocaine outside of maternal grandmother's home," had not attended to Kambon's medical needs, had failed to follow through with a welfare program for teenage mothers, and had failed to attend G.E.D. classes. MCCSB took Kambon into emergency care on March 11, 1997, and a medical examination revealed that he had fluid in his lungs and other medical and hygiene problems. MCCSB sought temporary custody of Kambon and requested child support and visitation orders.
A guardian ad litem was appointed to represent Kambon. Counsel were appointed to represent the interests of Thompson, Jackson, and Gresham. Thompson's counsel also served as her guardian ad litem. At the shelter care hearing, a magistrate placed Kambon in shelter care and committed him to the interim temporary custody of MCCSB. The magistrate noted that the case management and substitute care services that MCCSB had been providing "did not prevent the removal of the child from the child's home or enable the child to return home because the minor mother has a history of unruly behavior and of not meeting the child's medical needs."
On April 10, 1997, the magistrate adjudicated Kambon a neglected child and placed him in the legal custody of his maternal grandfather, Charles Thompson. The magistrate stated that the "information/referral; diagnostic; case management; counseling" services provided by MCCSB had not prevented the removal of Kambon because Thompson had put Kambon at risk by failing to cooperate with the safety plan. The magistrate approved the case plan, which required Thompson to pursue her G.E.D. at Longfellow school, to meet Kambon's basic needs, to be home by 11:00 p.m. during the week, to learn appropriate parenting skills by successfully completing teen parenting classes, and to attend supervised visits with Kambon. On April 15, 1997, MCCSB filed a motion seeking temporary custody of Kambon following Charles Thompson's decision that "he no longer wants custody of the child because he saw the mother and alleged father selling drugs."
That same day, the magistrate granted interim temporary custody to MCCSB and scheduled adjudicatory and dispositional hearings for May 15, 1997. Following the hearings, which Thompson did not attend, the magistrate awarded temporary custody of Kambon to MCCSB until April 13, 1998. The magistrate approved the updated case plan, which added the objectives that "Kenya will refrain from substance abuse which interferes with her ability to parent her child," by undergoing a drug/alcohol assessment and following through with recommendations and that she will work with school counselors to find an appropriate job placement. The visitation plan stated that Thompson would visit Kambon at the MCCSB office once a week for two hours. When Thompson's case plan was reviewed on August 12, 1997, the caseworker noted that she had dropped out of the G.E.D. program and that she was not motivated, that Kambon was doing well in foster care, and that she had made "no progress" on learning appropriate parenting skills. In the "Semiannual Administrative Review (SAR)" form, the caseworker noted that Thompson needed to undergo a drug test at "Pathways" and would be referred to "Independent Living" after its completion and that her visitation with Kambon had been "irregular."
Thompson's case plan was again reviewed in late December 1997, and caseworkers reported that Thompson had been expelled from G.E.D. classes for poor attendance, that she had been attending parenting classes at Lutheran Social Services, but did not complete the program, that her contact with caseworkers had been inconsistent, and that she had not visited with Kambon since October 1997.
On January 27, 1998, MCCSB filed a motion for permanent custody of Kambon with an affidavit from caseworker Kobie Edwards swearing that Thompson and Jackson had each visited him five times, that Jackson had not provided care or support for him since his birth, that they had failed continuously and repeatedly to substantially remedy the conditions causing Kambon to be removed from the home, and that they had demonstrated a lack of commitment toward Kambon. Edwards noted that Thompson had failed to complete her case plan objectives and had made no contact with her caseworker between August 1997 and January 1998. According to the affidavit, Jackson was incarcerated and had expressed a desire for Kambon to be adopted by his foster parents, and Gresham was not an appropriate relative placement because she had an open case with MCCSB.
On April 30, 1998, Kambon's guardian ad litem filed a report recommending permanent custody because Thompson had "done little to comply with the case plan," had "done nothing to ensure the agency that she can appropriately parent this child," and had no relatives available to assist her in becoming an appropriate parent. In a supplemental report, Kambon's guardian ad litem stated that Gresham was not an appropriate relative placement because she had not shown an interest in Kambon and she would have trouble finding child care while she worked second shift. Kambon's guardian ad litem also indicated that Jackson had sent him a letter stating that he was "no longer interested in the child" and that he would support an adoption by Kambon's foster parent.
On June 10 and 17, 1998, the magistrate conducted a permanent custody hearing. Neither Thompson nor Jackson attended, but both were represented by appointed counsel. Caseworker Doris Edelmann testified that she had provided case management services, information/referral services, and environmental resources to the family between February 1997 and April 1997. Edelmann stated that Kambon had been removed from Thompson's custody because Thompson had "continued to run the streets and was not home when she was supposed to be." Edelmann testified that Thompson had been referred to a teen parenting program and G.E.D. classes and had been directed to complete a drug and alcohol assessment, but Thompson had not followed through with the programs. She explained that MCCSB could not transport Thompson to these programs because she was not "an available person" due to her frequent relocations and short stays at different addresses.
Edelmann testified that MCCSB had dealt with Gresham since 1984 involving the alleged neglect of her children and that Gresham had failed to complete any treatment programs. She stated that, at the time of the hearing, Gresham had an "open case" due to Thompson's allegations that Gresham abused drugs and alcohol, physically abused Thompson, and suffered mood swings and that Gresham's "paramour" had pulled a knife and a gun on Thompson and Jackson. Edelmann testified that she had observed "a lot of drug traffic around [Gresham's] house." Edelmann explained that, when Charles Thompson had returned Kambon to MCCSB in April 1997, she had conducted home studies of Gresham and of Jackson's parents and that none of them had been approved.
Kobie Edwards, Thompson's caseworker since July 1997, testified that Thompson had not completed any of her case plan objectives even though Edwards and her predecessor had each explained the case plan objectives to Thompson and Edwards had referred Thompson to several agencies that offered services relevant to her case plan. Edwards testified that after Thompson had been released from detention in August 1997, she had completed a substance abuse assessment as required by an amendment to her case plan. According to Edwards, Thompson had attended some G.E.D. classes at the Longfellow program, but she was dismissed for poor attendance, and she had participated in parenting classes, but she "did not follow through with the recommendations and she didn't successfully complete the program." Thompson also obtained employment in April 1998, but she got fired after less than one month on the job. Edwards testified that Thompson had attended eight of the weekly visits with Kambon between March 1997 and June 1998, that she sometimes arrived late, and that in April 1998 when Thompson and Jackson had visited Kambon together, they had fallen asleep, allowing Kambon to wander into someone else's car. Edwards stated that she had sent letters to Thompson in November 1997 and April 1998 informing her that she had missed several visitations and reminding her of the importance of the visitations. Edwards sent Thompson a letter in January 1998 to inform her that MCCSB would seek permanent custody and requesting her to provide names of relatives or friends "to help assist our agency."
Edwards testified that Jackson had told her that he did not have any relatives able to accept custody of Kambon and that "there [were] some major concerns about maternal grandmother" due to Gresham's history with MCCSB, her failure to follow through with recommendations, her relationship with an alleged criminal, and the allegations that Thompson had made against her. According to Edwards, Gresham had attended one visit with Kambon since she had received the letter stating that MCCSB was pursuing permanent custody. Edwards expressed her opinion that permanent custody was in Kambon's best interest because "he needs permanency, he needs stability, and he needs some supervision and some support." Edwards testified that the foster mother had expressed an intent to adopt Kambon, that she would be a suitable adoptive parent, and that she did not predict any problems with securing an adoption of Kambon. On cross examination, Edwards admitted that she did not know the level of Thompson's ability to parent Kambon because no psychological evaluation had been conducted.
Gresham testified that she would not object to the foster parent adopting Kambon and that three months ago, Thompson had expressed her preference that Gresham obtain custody of Kambon, but as an alternative option, they both "would prefer that the foster mother have custody." Gresham expressed a strong interest in continuing to have a right to visit Kambon.
Kambon's guardian ad litem stated:
 My recommendation remains as it did at the last report, that permanent custody go to the Agency. I have conferred with the foster parents as well as the grandmother and the parties that I was able to contact. I do encourage the parties to cooperate should Ms. Thurman get adoptive placement with an open adoption so the child can have regular contact with the grandmother. I think that is everyone's desire in this case.
 I went to grandmother's house yesterday and it was appropriate. Grandmother is working long hours. It makes it very difficult to make regular contact. But again, my recommendation is for P.C. to the Agency and with the concurrence of the foster parents, the prospective adoptive parents, that the visitation be allowed to the grandmother.
Thompson's appointed counsel/guardian ad litem objected that adequate consideration had not been given to placing Kambon with a relative, such as Gresham, who was then in a "diversion program" for recent criminal charges, Thompson's sister, who was never evaluated, or other family members. She further expressed that Thompson was "too young to properly understand the ramifications of her actions and the responsibilities placed upon her by Children Services in that she was not given adequate support to either understand or to carry out the case plan."
The magistrate made the following factual findings pertaining to MCCSB's attempts to reunify Kambon with his parents:
18. The Agency has made reasonable efforts to:
a. prevent the removal of the child from his home;
b. eliminate the continued removal of the child from his home; and
c. make it possible for the child to return home.
 19. The Agency has provided case management, information and referral and substitute care services to the family.
 20. These services neither prevented the removal of the child from his home nor enabled him to return home.
The magistrate concluded that Kambon "should not be placed with either parent since neither parent affirmatively demonstrates a present capacity to provide care," could not be placed with Thompson within a reasonable period of time because "her whereabouts are unknown, she has no stable housing or income, she has not completed any case plan objectives, and she has visited but eight (8) out of approximately 65 visits" and she "failed to communicate with, support or otherwise parent her child for over 15 months." The magistrate further concluded that there were no relatives suitable to take care of Kambon, that Kambon was adoptable, and that permanent custody to MCCSB was in Kambon's best interest.
On July 14, 1998, Thompson filed objections to the magistrate's findings that MCCSB had made reasonable efforts to prevent the removal of Kambon, that MCCSB's services had not prevented the removal or enabled Kambon to return home, that she lacked stable and appropriate housing, and that she was capable of understanding and completing the case plan objectives and mature enough to understand the permanency of the proceedings. Thompson also challenged the magistrate's conclusions that clear and convincing evidence existed that Kambon could not be placed with her and that the commitment was in his best interests. In supplemental objections, Thompson urged that MCCSB had not given her adequate opportunity to comply with her case plan or to "gain the maturity and treatment necessary to make a real effort at reunification" and had not considered all of her relatives as potential placements. Thompson further claimed that the magistrate had not considered her desire to straighten out her life and to reunify with Kambon and her efforts to comply with the case plan objectives.
The trial court overruled Thompson's objections on November 3, 1998, stating that Kambon could not be placed with either parent within a reasonable period of time because she was unable to be located, had repeatedly failed to take advantage of the services offered by MCCSB that may have made reunification possible, and had not attended most of the scheduled visitations. The trial court further determined that Jackson had shown no desire to be a parent to Kambon during the past fifteen months, that MCCSB had adequately considered all potential relatives of which they had knowledge, that MCCSB had had a reasonable expectation of placing Kambon for adoption, that it was in Kambon's best interest to be placed in the permanent custody of MCCSB, and that Thompson had not offered any legal basis for her claim that her age and immaturity prevented her from understanding the proceedings.
Thompson filed a notice of appeal, and she raises one assignment of error.
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY RENDERING A FINDING OF FACT THAT THE AGENCY HAD MADE REASONABLE EFFORTS TO "MAKE IT POSSIBLE FOR THE CHILD TO RETURN HOME" IN VIOLATION OF O.R.C. 2151.414(E) (1).
Thompson contends that MCCSB failed to make reasonable efforts to reunify her with Kambon.
Before awarding permanent custody of a child to a public children services agency or a private child placing agency, the trial court must find by clear and convincing evidence "that (1) one or more of the eight specifically enumerated factors in R.C. 2151.414(E) are present, that (2) permanent custody is in the best interest of the child, and that (3) reasonable efforts at reunification have been made or that such efforts would be futile." In re Lawson/Reid Children (Apr. 18, 1997), Clark App. No. 96-CA-0010, unreported. See, also, R.C. 2151.353(A) (4), R.C.2151.414(E), R.C. 2151.419. If the trial court finds by clear and convincing evidence that one or more of the factors listed in R.C.2151.414(E) exist as to each of the child's parents, the trial court shall enter a finding that the child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent. Whether permanent commitment is in the child's best interest is a matter for the discretion of the trial court and should be determined pursuant to R.C.2151.414(D). In re Awkal (1994), 95 Ohio App.3d 309, 316. The version of R.C. 2151.419(A) in effect at the time of the permanent custody hearing provided in pertinent part:
 (A) At any hearing held pursuant to section * * * 2151.353 of the Revised Code at which the court removes a child from his home or continues the removal of a child from his home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from his home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from his home, to eliminate the continued removal of the child from his home, or to make it possible for the child to return home. The agency shall have the burden of proving that it has made those reasonable efforts. * * *
 (B) The court shall issue written finding of facts setting forth its determination under division (A) of this section. In its written finding of facts, the court shall briefly describe the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from his home or enable the child to return home.
A reunification plan imposes duties on the agency and on the parent, and whether a failed reunification is attributable to the agency or the parent must be decided on a case by case basis. In re Fast (Mar. 25, 1992), Summit App. No. 15282, unreported. In Fast, the court rejected the mother's argument that permanent commitment of her child was inappropriate because the agency had not taken "all available efforts" at reunification. The Fast court pointed out that "there will always be some additional service which, however remote, might have enabled the reunification of parent and child. The issue is not whether CSB could have done more, but whether it did enough to satisfy the `reasonableness' standard under the statute." Id.
In our judgment, the trial court acted within its discretion in determining that MCCSB had done reasonable case planning and had made diligent efforts to help Thompson and Jackson remedy the conditions that initially caused Kambon's removal from the home. The undisputed testimony of Edelmann and Edwards was that caseworkers had created a case plan for Thompson, had referred her to agencies for assistance in completing the objectives of the case plan, had evaluated relatives as possible placements for Kambon, and had offered her the opportunity for regularly scheduled visits with Kambon. Despite these efforts, Thompson hindered the reunification process by failing to complete her case plan objectives, by making herself unavailable to caseworkers, and by participating in drug trafficking with Jackson. Thompson argues that MCCSB did not reasonably pursue reunification because it failed to remove her from the home of Gresham, who had allegedly abused and neglected her. Although MCCSB could have sought to remove Thompson from the home of Gresham, it was not necessarily required to do so. MCCSB was required to take reasonable efforts toward reunifying Kambon with his parents, not to take every possible measure. See Fast, supra. Furthermore, Thompson has not demonstrated that removing her from Gresham's home would have made reunification possible. She presented no evidence that Gresham prevented her from completing the objectives in her case plan. Based on the caseworkers' testimony and the report of Kambon's guardian ad litem, the trial court reasonably determined that Kambon could not be placed with either parent within a reasonable period of time or should not be placed with either parent, that permanent commitment was in his best interest, and that MCCSB had taken reasonable efforts to reunify Kambon with his parents. Thus, the trial court did not abuse its discretion in awarding permanent custody to MCCSB.
Thompson also complains on appeal that "when it was pointed out to the Court that Kenya had failed to attend the hearing because she was incarcerated and that the Agency took no effort to have her transported to trial," the magistrate should have continued the hearing so that she could be present. The state responds that Thompson "was a chronic runaway and was in fact AWOL at the time of the hearing." Because Thompson did not present the issue of the magistrate's failure to continue the hearing to the trial court, she waived the right to raise it on appeal, and we will review the trial court's adoption of the magistrate's decision despite the denial of a continuance for plain error. Civ.R. 53(E) (3) (b). The issue of Thompson's absence from the hearing arose during the during the June 10, 1998 cross- examination of Edwards:
Q. Do you know where [Thompson] is today?
 A. I have received brief information * * * before the court hearing, [from] maternal grandmother, and she told me that she was locked up again, incarcerated.
 Q. All right. Have you been able to keep track of Kenya since you've had Kambon in care?
A. No, I haven't.
The state explained that it had not learned about Thompson's incarceration until that morning. Counsel for Jackson then moved for a continuance, stating, "I think we need to have the mother's testimony," and Thompson's counsel/guardian ad litem joined the motion, which the magistrate overruled without explanation. Thompson's counsel cross examined Edwards on the fact that Thompson had followed through with the case plan objective of the substance abuse assessment, as shown by the fact that she was "at Pathways today." Edwards responded that she did not know if Thompson was at Pathways and that she had "tried to find out where she was," but did not know where Thompson had been for the past few weeks or whether Thompson had been referred for inpatient treatment at Pathways. The proceedings were continued until June 17, 1998 for other reasons, and at that time, Edwards further explained her knowledge of Thompson's whereabouts:
 Q. Kobie, at the last hearing during your testimony, you * * * informed the Court about what efforts you had made to contact Kenya in the case. Since the last hearing have you received any new information regarding Kenya's whereabouts?
A. Yes, I did.
Q. And where was that?
 A. When I first came, before the court hearing had started, I talked briefly to Ms. Gresham, and she stated to me that Kenya was in jail. She never elaborated as far as where she was. And after the court hearing I talked to Ms. Gresham a little bit more and she stated to me she's in Pathway.
 So when I got back to the Agency, I called Pathway and * * * it was verified that she was scheduled for outpatient May 18, 1998. She was supposed to attend three days out of a week, and she only attended one session. So they did detain her and she was put in inpatient on June 9, 1998. From that time she has pulled the fire alarm and she's ran away from Pathway.
 Q. At the time of this hearing are you aware of the whereabouts of Kenya?
A. No, I don't know where she is.
Trial courts have broad discretion in deciding whether to grant a continuance. State ex rel. Vanderlaan v. Pollex (1994), 96 Ohio App.3d 235,236. "Further, the right of an incarcerated parent to attend a permanent custody hearing is also within the sound discretion of the trial court," and his right to a continuance is not absolute. Id. at 236-237. To determine parental due process rights in permanent custody proceedings, Ohio courts use the balancing test set forth in Matthews v. Eldridge (1976),424 U.S. 319, 335. In re Sprague (1996), 113 Ohio App.3d 268, 276. The factors for consideration are "(1) the private interest affected, (2) the risk of erroneous deprivation and the probable value of additional safeguards, and (3) the governmental burden of additional procedural requirements." Id. at 276, citing Mathews, 424 U.S. at 335.
Although Thompson's fundamental right to parent Kambon is extremely significant, she has not demonstrated an interest in exercising this right. The risk of erroneously depriving Thompson of her interest in parenting Kambon without hearing her testimony was low because she was represented by counsel at the hearing and the evidence overwhelmingly demonstrated that she had put forth minute effort to cooperate with MCCSB in seeking a reunification with Kambon. We cannot determine the probable value of continuing the hearing so that Thompson could be present because she did not demonstrate an interest in attending the hearing or show that she would have made herself available for the hearing had it been continued. Indeed, Edwards testified on June 17, 1998 that Thompson had run away from Pathways and that her whereabouts were unknown. In our judgment, the governmental interest in protecting Kambon's best interest outweighs Thompson's interest in appearing in person at the hearing. The record does not suggest that the result clearly would have been different had Thompson attended the hearing. Thus, the magistrate did not commit plain error in overruling the motion for a continuance.
The assignment of error is overruled.
The judgment of the trial court will be affirmed.
BROGAN, J. And FAIN, J., concur.
Copies mailed to:
Carley J. Ingram
J. Allen Wilmes
Hon. Nick Kuntz